Bradley J. Broyles and Kathryn A. Broyles, et. al. [1] v. Commissioner Broyles v. Commissioner
Docket Nos. 89121, 89122, 89284.
United States Tax Court
T.C. Memo 1962-215; 1962 Tax Ct. Memo LEXIS 94; 21 T.C.M. (CCH) 1148; T.C.M. (RIA) 62215; September 13, 1962
*94 John L. Flynn, Esq., 311 Failing Bldg., Portland, Ore., for the petitioners in Docket Nos. 89121 and 89122. Jerome S. Bischoff, Esq., for the petitioner in Docket No. 89284. Aaron S. Resnik, Esq., and Donald G. Daiker, Esq., for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: In these consolidated proceedings, the Commissioner determined deficiencies in income tax against the various petitioners as follows: Docket
Deficiency
No.
Petitioners
1956
1957
89121
Bradley J. Broyles
and Kathryn A.
Broyles
$2,525.22
$3,404.01
89122
Adlee C. Broyles
and Neva I.
Broyles
2,882.57
4,243.82
89284
Lumber Products,
Incorporated
2,237.14 [2]
The only issue for decision is whether any portion of the purchase price paid by Lumber Products, Inc., to the partnership of Bradley Broyles and Adlee Broyles for their wholesale lumber business was attributable to goodwill and/or to an agreement not to compete. [3]
*95 Findings of Fact The parties have stipulated certain facts. The stipulated facts, together with exhibits, are incorporated herein by this reference. During the years 1956 and 1957, petitioners Bradley J. and Kathryn A. Broyles, husband and wife, and Adlee C. and Neva I. Broyles, husband and wife, resided in Medford, Oregon, and filed timely joint income tax returns for said years with the district director of internal revenue at Portland, Oregon. Lumber Products, Inc., an Oregon corporation, filed its U.S. Corporation income tax return for the fiscal year ended June 30, 1957, with the district director of internal revenue at Portland, Oregon. Since 1939, Lumber Products, Inc., has been engaged in the wholesale building material business. Its sales are made solely to retailers (lumber yards) or to State and Federal agencies. It sells by means of travelling salesmen and mail order catalogs a general line of merchandise, including plywood, doors, shingles, stain, nails, wire and hardwood lumber. The home office of Lumber Products, Inc., is in Portland, Oregon, and the company maintains warehouses in Salem, Medford and Eugene, Oregon. The company's sales area extends as far south *96 as northern California. The petitioners Bradley J. Broyles and Adlee C. Broyles in the early part of 1952 entered into a partnership for the purpose of engaging in the wholesale lumber and builders' supply business in Medford, Oregon. The partnership was known as the Broyles Lumber Company [4] and sold to retail stores and lumber yards substantially the same type of merchandise as Lumber Products, Inc. The partnership had no exclusive sales privileges with regard to any of the products which it sold. Its sales area extended from southern Oregon to northern California, and sales were made by salesmen and through the mailing of a catalog to prospective customers. For some time Adlee Broyles was the only outside salesman employed by the Broyles Lumber Company. The Broyles Lumber Company conducted its operations from a warehouse in Medford which the Broyleses had erected in 1952 at a cost of $32,239.28. The warehouse was serviced by a railroad spur track. In 1955 the Broyles Lumber Company built an addition to its warehouse at a cost of $14,753.10. From *97 1952 to March 1956, the Broyles Lumber Company was the only wholesale lumber supplier that possessed warehouse facilities in the Medford area. Lumber Products, Inc., used its own truck to deliver material to customers in the Portland area. Deliveries outside of the Portland area were handled by commercial carriers. The Broyles Lumber Company made no deliveries with its own equipment. Merchandise was either picked up by the customer or shipped by common carrier. The wholesale lumber supply business in the southern Oregon-northern California area was highly competitive with approximately 12 to 15 different firms competing for the same business. The merchandise handled by the various wholesalers, whether branded or not, was usually available to all the wholesalers. Furthermore, the products regardless of manufacturer were for the most part sold according to standardized quality or grade. As a consequence of these conditions, the customers had to be continuously solicited and price and availability were often the determining factors in whether a particular wholesaler obtained an order. In the Medford area there were about 10 retail lumber yards. With regard to these particular yards, *98 Broyles Lumber Company possessed certain advantages over its competitors. First, Broyles Lumber Company could offer immediate across-the-counter delivery of items requested by retailers, and second, it could offer somewhat lower prices than those of its competitors since its shipping costs were either eliminated or substantially reduced. Thus, the opening of the Broyleses' facilities in Medford had some impact upon the business then being done in the area by Lumber Products, Inc. With the exception of sales to retail outlets in the immediate area, the location of the wholesale lumber dealer had little effect upon the obtaining of an order and as a result Lumber Products, Inc., as well as other wholesale lumber companies, solicited orders from most of the Broyles Lumber Company customers outside of the Medford area. From its inception Broyles Lumber Company was financially successful, and its success improved with each year of operation. In 1955, Lumber Products, Inc., decided to set up a warehouse operation in Medford in order to be in a better position to serve the southern Oregon-northern California area. It contacted the Broyleses to see if they were interested in selling. *99 They were not. Lumber Products, Inc., then surveyed the area in order to find a suitable warehouse to buy or lease. Unable to find such a property, Lumber Products, Inc., obtained an option on some land one mile north of Medford with the expectation of building a 10,000 sq. ft. concrete warehouse. The land cost was to be $10,200. An architect was engaged to draw up the plans for the proposed warehouse. At the same time Lumber Products, Inc., proceeded to obtain estimates from contractors on the cost of constructing the warehouse. It was expected that the warehouse would cost about $4.50 to $5.00 a square foot to build. While in the midst of such negotiations, the vice president of Lumber Products, Inc., received a call from the Broyleses and was informed that they might consider selling their business to Lumber Products, Inc. The parties arranged to meet in Portland, Oregon, sometime during the period the Western Retail Lumbermen's Convention was in progress. The Broyleses' decision to sell to Lumber Products, Inc., was motivated by the following factors: First, the Broyleses had been working hard to establish and maintain the business and believed that their health might be adversely *100 affected if they continued at the same pace. Second, Bradley Broyles' son suffered from asthma, and it was felt that a drier climate might prove beneficial to the boy. Third, many plywood mills were being constructed in the area and were beginning to deal directly with the retailer. This situation was causing a breakdown in the traditional relationship between manufacturer-wholesaler-retailer, and was resulting in a lessening of profits for the wholesaler. Fourth, with Lumber Products, Inc., definitely planning to move into the Medford area, the Broyleses would be faced with even stiffer competition and would lose much of their competitive advantage. The Broyleses met with representatives of Lumber Products, Inc., in Portland during the latter part of January 1956. Prior to the meeting the Broyleses had decided between themselves that they wanted $130,000 for the land and buildings, plus an additional sum for their inventory and equipment. In arriving at this price the Broyleses considered the worth of a similar business in a comparable area, and the fact that their business was successful. At the meeting the Broyleses stated that they were prepared to sell and named the price they *101 wanted for their business. Representatives of Lumber Products, Inc., did not discuss the proposed price but inquired as to whether or not after the sale the Broyleses intended to establish a new business in competition with Lumber Products, Inc. The Broyleses stated that they had no such intention and that they would agree not to compete in Medford. Nothing was said at the meeting regarding the presence of goodwill as an item of the sale and nothing was said with regard to the price, if any, of the agreement not to compete. The representatives of Lumber Products, Inc., agreed to consider the offer and to notify the Broyleses of their decision. About one week later a representative of Lumber Products, Inc., called the Broyleses and informed them that Lumber Products, Inc., had decided to accept their offer. Nothing was said during this telephone conversation regarding the agreement not to compete. Although the price of $130,000 was considerably more than what Lumber Products, Inc., would have had to spend in order to construct its own warehouse, Lumber Products, Inc., considered the price to be fair in view of the fact that it would be eliminating a competitor and the fact that *102 it would be acquiring a concern which could commence doing business immediately. Prior to accepting the Broyleses' offer to sell, Lumber Products, Inc., made no effort to have the Broyleses' property appraised or to ascertain the extent of Broyles Lumber Company sales and profits for earlier years. The attorneys representing each of the parties to the sale met on several occasions in order to prepare the contract of sale. At the first meeting of the attorneys nothing was said concerning the agreement not to compete, and the first draft prepared by the attorneys contained no such agreement. However, in the drafts subsequently prepared by the attorneys an agreement not to compete was inserted. The goodwill of Broyles Lumber Company was never discussed at these meetings by either the principals or their attorneys. The Contract of Sale accepted by the parties and executed on March 21, 1956, provided, in part, as follows: 1. The Vendors agree to sell to the Purchaser and the Purchaser agrees to buy from the Vendors the real and personal property * * * for the purchase price of Two Hundred Sixty-three Thousand Two Hundred ($263,200.00) Dollars. The purchase price of said real property *103 is $130,000.00, the purchase price of said lift trucks and office equipment is $8,200.00, and the purchase price of said stock in trade is $125,000.00. * * *
14. Adlee C. Broyles and Bradley J. Broyles agree to continue attendance at the business herein sold during working hours until August 1, 1956, to advise Purchaser and help Purchaser get acquainted with the business area and business practices of Vendors. And Vendors agree that Purchaser may send an employee during working hours to Vendors' place of business during the month of June to learn the business arrangements and stock in trade purchased in Vendors' business. Desk room shall be made available for each party during the months of June and July in the office of the said business. 15. The Vendors covenant that for a period of ten (10) years commencing June 30, 1956, neither the Vendors, nor Adlee C. Broyles nor Bradley J. Broyles, shall, individually or jointly with any other person, establish or carry on any business of wholesale or jobbing of building material within the State of Oregon or that part of California lying north of a line commencing at the mouth of the Klamath River and running thence to Dunsmuir, and *104 thence to Alturas, and thence east to the Nevada line. However, nothing in this agreement shall prevent the Vendors, or either of said partners, from engaging in the wholesale or brokerage of lumber to accounts outside the above-mentioned territory. * * *
The Contract of Sale did not convey to Lumber Products, Inc., the Broyles Lumber Company trade name, the accounts receivable of Broyles Lumber Company or the Broyles Lumber Company files. The fair market value of the land conveyed to Lumber Products, Inc., by Broyles Lumber Company was $10,000. The fair market value of the Broyles Lumber Company building was $119,000. *
After the parties had reached an agreement concerning the terms of the sale, the Broyleses notified their customers and suppliers that after June 30, 1956, the business would be owned by Lumber Products, Inc. On June 1, 1956, Lumber Products, Inc., sent one of its employees to Broyles Lumber Company to learn as much about the Broyleses' business as he could. The *105 Broyleses acquainted the Lumber Products representative with the peculiarities of their business and the lines they handled. They also introduced him personally or by phone or letter to their customers and their suppliers. On June 30, 1956, the Broyleses formally turned over the business to Lumber Products, Inc. Opinion This case confronts us with the not unusual situation in which the respondent, in order to protect the revenue, takes inconsistent positions with respect to the tax consequences of the same transaction. In Docket Nos. 89121 and 89122 respondent has allocated a portion of the purchase price to an agreement not to compete and seeks to tax the allocated portion as ordinary income to the petitioners (sellers). In Docket No. 89284 respondent has allocated a similar portion of the purchase price to goodwill and as a result has determined that petitioner's (buyer's) deduction for depreciation on its acquired building is excessive. It is evident that the issue common to both cases is whether any part of the purchase price paid by Lumber Products, Inc., to Broyles Lumber Company is attributable to goodwill and/or to the agreement not to compete. We will direct our attention *106 first to the matter of goodwill. In the Cyclopedic Law Dictionary (1940 Ed.) "good will" is defined as follows: The benefit which arises from the establishment of particular trades or occupations. The advantage or benefit which is acquired by an establishment, beyond the mere value of capital, stocks, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices. Story, Partn. § 99. * * * It includes only that estimation and repute which is peculiar to the particular establishment. It is that species of connection in trade which induces customers to deal with a particular firm. In , we stated that "the goodwill of a business is the potential of that business to realize earnings in excess of the amount which might be considered a normal return from the investment in the tangible assets." Obviously, the above definitions *107 provide no specific rule for determining the presence of goodwill in a particular case. Lacking such a specific rule, the courts have found it necessary to develop certain judicial criteria which, when considered together, have proven to be a reasonably reliable standard for determining the presence of goodwill. Among these criteria are: Did the company operate under the same name in the same community for a long period of time; [5] were the company's earnings suggestive of any abnormal profits; [6] did the company possess any trademarks, patents, exclusive brands or exclusive selling privileges; [7] did the company advertise extensively; [8] did sales depend to a large degree upon continuing personal contact with customers; [9] did the company possess a stable customer list; [10] did the company face substantial competition; [11] did the company possess competent and efficient management; [12] and did any unusual economic conditions exist. [13]
*108 After carefully studying the record and taking into consideration the various criteria bearing on goodwill, we have concluded that Broyles Lumber Company possessed little, if any, goodwill. The evidence bearing on this issue discloses that the Broyles Lumber Company had been in the wholesale lumber business for approximately five years; that the business was highly competitive and sales were dependent for the most part upon price and availability; that Broyles Lumber Company did little advertising and orders were obtained primarily through the personal solicitation of Broyles Lumber Company's salesmen; that customers had to be continuously solicited; that the company handled no exclusive brands and its competitors generally stocked the same items or items of similar quality; that although the Broyles Lumber Company was successful, its success was largely attributable to the abilities and efforts of its two partners; and that while the company possessed a competitive advantage with regard to its local business there was no indication that it earned abnormal profits. Respondent's argument to the contrary is to the effect that the fair market value of the Broyles Lumber Company's *109 building [14] was far less than the $120,000 purportedly paid for it, and that Lumber Products, Inc., was willing to pay the difference between the fair market value and the purchase price in order to eliminate a competitor and to be in a position to commence immediate operation in the Medford area. We are not entirely convinced that the fair market value of the Broyleses' building was considerably less than $120,000. [15] In any event, while the willingness of a buyer to pay an excessive price for the tangible assets of the seller's business may be indicative of the presence of certain other intangible values, it is by no means conclusive. As previously noted, the weight of the evidence in this case negatives the existence of goodwill. We hold, therefore, that the respondent in Docket No. 89284 erred in disallowing a portion of the deduction claimed by petitioner for depreciation on the Broyles Lumber Company's building. We must now consider *110 whether or not any part of the purchase price paid by Lumber Products, Inc., to the Broyleses was, in fact, attributable to the covenant not to compete. The answer to this question depends upon whether the parties treated the covenant as a separate and distinct item in their negotiations and whether the purchaser actually paid anything for the covenant as a separate item in the deal. ; , affd. (C.A. 10, 1954); , affd. (C.A. 4, 1960), certiorari denied . The record reveals that the Broyleses met the representatives of Lumber Products, Inc., and offered to sell their business for $130,000. Some discussion took place at the meeting as to whether or not after the sale the Broyleses intended to establish a new business in competition with Lumber Products, Inc. About one week later a representative of Lumber Products, Inc., called the Broyleses and informed them that their offer had been accepted. Nothing was said at that *111 time regarding the covenant not to compete. The attorneys representing the Broyleses and Lumber Products, Inc., respectively, met on several occasions to prepare a contract of sale. At their first meeting nothing was said concerning the covenant not to compete and their first draft of a contract of sale contained no such covenant. At the instigation of Lumber Products, Inc., a covenant not to compete was inserted in subsequent drafts and was ultimately incorporated into the finally executed contract. No specific sum was ever discussed by the parties as consideration for the covenant not to compete, and no sum was allocated in the sales contract to the covenant not to compete. The price paid the Broyleses for their business was the same amount they had demanded at the Portland meeting. We think the evidence clearly indicates that no separate part of the consideration was paid for the covenant not to compete. We hold, therefore, that the respondent in Docket Nos. 89121 and 89122 erred in taxing a portion of the sums received by the petitioners from the sale of their business as ordinary income. Decision will be entered under Rule 50 in Docket Nos. 89121 and 89122. Decision will *112 be entered for the petitioner in Docket No. 89284. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Adlee C. Broyles and Neva I. Broyles, Docket No. 89122; and Lumber Products, Incorporated, Docket No. 89284.↩
2. Taxable year ended June 30, 1957.↩
3. In Docket Nos. 89121 and 89122 the Commissioner's deficiency notices contained other adjustments to petitioners' reported income for the years 1956 and 1957. However, at the trial of these cases, no evidence was presented with respect to these matters, and consequently, the Court has assumed that these items have been conceded by the respective petitioners.↩
4. At first the partnership was known as Broyles Wholesale Company but the name was later changed to Broyles Lumber Company.↩
*. The sentence "The fair market value of the Broyles Lumber Company building was $119,000" was added by an official order of the Tax Court dated October 22, 1962, and signed by Judge Fay.↩
5. ; . ↩
6. ; , affd. (C.A. 9, 1961); . ↩
7. ; ; . ↩
8. ; ; ↩
9. ; ; ↩
10. ; ↩
11. ; ; ↩
12. ; ; ; ↩
13. ; ↩
14. Respondent's expert witness testified that in his opinion the Broyles Lumber Company building was worth approximately $69,000. ↩
15. Petitioners' expert witness testified that in his opinion the building was worth approximately $119,000.↩